Stephanie R. BROOKS and Michele Shaffer, on behalf of themselves and others similarly situated, Plaintiffs,

v.

FARM FRESH, INC., Defendant.

Civ. A. No. 90–1607–N.

United States District Court, E.D. Virginia, Norfolk Division.

Feb. 21, 1991.

On Motion for Reconsideration April 3, 1991.

---

Norman Olitsky, Olitsky & Olitsky, Portsmouth, Va., Roland P. Wilder, Jr., Carey R. Butsavage, Baptiste & Wilder, P.C., Washington, D.C., for plaintiffs.

Abram William Vandermeer, Jr., Sharon Smith Goodwyn, Hunton & Williams, Norfolk, Va., Thomas Joseph Flaherty, Michael Peter Oates, Hunton & Williams, Richmond, Va., for defendant.

## ORDER

CLARKE, District Judge.

## ORDER

This matter comes before the Court on the motion of the defendant, Farm Fresh, Inc. (Farm Fresh), to disqualify the law firm that represents the plaintiffs. The plaintiffs, present and former employees of Farm Fresh, have brought this action against Farm Fresh under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219. The plaintiffs claim that Farm Fresh has violated the FLSA by requiring them to work off-the-clock hours, and to work overtime hours at regular, rather than overtime, pay rates.

The defendant has moved to disqualify plaintiffs' counsel, the law firm of Baptiste & Wilder, P.C. Farm Fresh argues that

because of the ties between Baptiste & Wilder and Local 400 of the United Food and Commercial Workers Union (the Union), and because of the interest and involvement of the Union in the progress and outcome of the lawsuit, the plaintiffs' attorneys cannot adequately represent the interests of their clients. The parties have asked the Court to decide the defendant's motion based on their pleadings.

## I.

Under the FLSA, employees may bring civil actions against their employers to enforce the provisions of the Act:

An action to recover the liability prescribed [in this Act] may be maintained against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). As of the date of this order, 125 plaintiffs have opted into this action by signing consent forms which have been filed with the Court.[1] Earlier in the case, the plaintiffs asked the Court to approve a notice that their attorneys had drafted and were proposing to send out to other current and former Farm Fresh employees. The plaintiffs described the proposed recipients of the notice as:

All past and present hourly employees of Farm Fresh, Inc. who, at any time after September 6, 1987, were employed in the Company's retail store operations as cashiers, meat cutters, drivers, clerks, stockpersons, baggers or similar jobs whose duties did not qualify them as managers, administrators or professionals exempt from the Fair Labor Standards Act.

Plaintiffs' Memorandum in Support of Motion for Approval of Plaintiffs' Notice to Similarly Situated Employees, at 4. The parties have tentatively agreed that the above-described group numbers approximately 27,000 people. The plaintiffs argued that the case involved questions of law and fact common to all the current plaintiffs, and common to all potential plaintiffs, because all "assert similar claims (unpaid wages) and seek similar relief (recovery of unpaid wages)." Plaintiffs' Reply to Defendant's Brief in Opposition to Motion for Approval of Plaintiffs' Notice to Similarly Situated Employees, at 5. The plaintiffs therefore argued that the Court should facilitate notice to the "class" of potential plaintiffs, so that these common questions of law and fact could be resolved in a single judicial proceeding. In reply, Farm Fresh argued that the plaintiffs and potential plaintiffs were not "similarly situated" for purposes of the FLSA because the plaintiffs claimed a wide variety of wage violations, and because Farm Fresh had a wide variety of defenses to the claims.

The Court declined to approve plaintiffs' notice to potential plaintiffs. The Court found that the parties had not developed enough factual material for the Court to determine whether the plaintiffs were "similarly situated" under the FLSA. The Court was also concerned that it was being used as a bargaining chip in an organizing campaign, and that the Union may have misled some of the opt-in plaintiffs into signing their consent forms. The Court determined that the parties should proceed with discovery in general, and with the depositions of named and opt-in plaintiffs in particular, in order to help the Court determine whether the named plaintiffs, opt-in plaintiffs, and potential plaintiffs were "similarly situated" under the FLSA. The Court instructed the parties to return

---

1. The Court received 18 executed consent forms with the plaintiffs' Complaint. Later, plaintiffs' counsel filed 110 additional consent forms, but three plaintiffs had filled out two forms each, so 110 forms actually represent only 107 plaintiffs. Thus, combining the two named plaintiffs, the eighteen plaintiffs whose consents accompanied the Complaint, and the 107 plaintiffs who later joined the case by filing their consent forms, the Court concludes that 127 persons have become parties plaintiff to this action, Stephanie Brooks and Michele Shaffer by being named in the case, and 125 others by filing consent forms.

to the Court when either had discovery material to support their respective contentions that the plaintiffs were or were not "similarly situated."

Since the hearing on the plaintiffs' Motion for Approval of Notice, the parties have returned to the Court twice because they have not been able to agree on the proper scope of discovery. Farm Fresh argued that under the discovery rules, it had the right to depose each of the 127 parties plaintiff. The plaintiffs argued that because they intended to prove their case at trial through representative testimony, Farm Fresh was not entitled to depose each opt-in plaintiff. The Court held that Farm Fresh was entitled to depose the opt-in plaintiffs, at least until either party felt that the record was sufficiently developed for the Court to determine whether the case should proceed as a representative action. This determination would again depend upon the plaintiffs ability to show that they were "similarly situated" under the FLSA, or the defendant's ability to show that they were not. The defendant has now moved the Court to disqualify the plaintiffs' attorneys.

## II.

The current lawsuit is the latest part of a Union effort to organize food workers at Farm Fresh stores in Virginia. According to an affidavit filed by Farm Fresh's Vice President of Human Resources, Al Wanzelak, the Union first undertook this effort in 1986, resumed it in 1987, and resumed it again in April of 1990. The plaintiffs have not contested these facts. It is clear from the hearings the Court has held, from the pleadings, affidavits, supporting materials and the consent forms themselves, that this action has been brought at the instance of the Union, and that the Union has maintained its presence to this day. Some of the materials distributed by Union organizers, materials that apparently produced at least a portion of the consent forms in this action, make the Union's interests clear. One flyer read in part as follows:

Do you have this problem—lots of overtime, with little to show for it in your paycheck?

Do you sometimes work right through your lunch hour, and don't get paid for it?

Has management got this crazy system where overtime is paid at a rate LESS than regular hours? Crazy to you, maybe, but not to management. They make out like bandits, at your expense!

You KNOW what your problem is: You need a UNION.

What difference does a union make?

If you have to work overtime, you get paid for every minute worked. And the rate for overtime goes UP, not DOWN!

That isn't a promise. It's a written guarantee. In a union contract.

Another handout, signed by the President of the Union, Tom McNutt, read in part:

You should know by now that a lawsuit has been filed on behalf of Farm Fresh employees to get back the money Farm Fresh has cheated you out of by making you work off the clock.

You know they make you work off the clock. You know that it happens all the time. Farm Fresh now writes you a letter saying its their "policy" not to do it, you know the truth.

Why does Farm Fresh write you a letter now about working off-the-clock? BECAUSE THEY KNOW ITS TRUE AND THEY'RE AFRAID OF THE AMOUNT OF MONEY THEY WILL HAVE TO PAY YOU.

Don't be fooled and don't be intimidated by Farm Fresh promises and Farm Fresh threats. Hundreds of employees have already come forward to be plaintiffs in this lawsuit and the number continues to grow.

REMEMBER—YOU HAVE TO SIGN A CONSENT FORM, IF YOU HOPE TO GET BACK THE MONEY THAT FARM FRESH OWES YOU IF YOU'VE WORKED OFF THE CLOCK.

The Union has already made a difference—and this is just the beginning.

These materials,[2] and other materials distributed by the Union, show that the Union is taking credit for this lawsuit, and attempting to use the lawsuit as an organizational tool. If the plaintiffs had brought this lawsuit on their own initiative, and had hired attorneys who were not associated with the Union, the Union's interests in the lawsuit might be irrelevant. The Union's interests in the lawsuit have become relevant, however, largely because the attorneys for the plaintiffs are associated with the Union.

### III.

Baptiste & Wilder represents the plaintiffs in this case. Baptiste & Wilder also represents the Union, in other matters. Transcript of Proceedings, at 17–18 (December 19, 1990); Transcript of Proceedings, at 6 (January 10, 1991). The defendant claims that Baptiste & Wilder is the Union's "chief outside counsel," and the law firm does not dispute this characterization. Defendant's Reply Brief in Support of its Motion to Disqualify Plaintiffs' Counsel, at 2. As part of its latest organizational campaign, begun in April, 1990, the Union asked Baptiste & Wilder to prepare questionnaires and consent forms to be distributed by Union organizers to Farm

Fresh employees. Deposition of Union official James L. Hepner, at 48–49, 55 (Nov. 19, 1990). Union organizers distributed the consent forms at the same time that they distributed the handouts the Court has already reviewed. Many of the consent forms specified that they were to be returned to the Union. The Union gave the forms to the attorneys at Baptiste & Wilder, who then instituted this lawsuit. Since then, the Union has been paying the costs of the lawsuit, Transcript of Proceedings, at 14–15 (January 10, 1991), and the plaintiffs' attorneys apparently have not discussed fee arrangements with any of their clients.[3]

The issue before the Court is therefore clear: May a Union that is conducting a so far unsuccessful organizational campaign targeting a specific employee population ask its attorneys to design and prosecute a lawsuit on behalf of some of those employees against their employer under the Fair Labor Standards Act, fund the costs of the lawsuit, and attempt to use the existence of the lawsuit to garner support for its organizational effort, all without impairing the ability of the attorneys to represent the interests of the employees rather than the interests of the Union?

---

**2.** In an earlier order, the Court described these materials as "inflammatory and potentially misleading," and stated that they were more suited to a labor dispute than a court proceeding. The Court would not normally review campaign literature for accuracy or propriety in an FLSA lawsuit, but the conduct of the Union and the attorneys in this case have made these materials part of the case. The materials tell employees that they have been cheated, and that "hundreds" of their fellow employees have joined the lawsuit against Farm Fresh. In fact, only 127 employees have joined the lawsuit. The materials also give the impression that a Union contract is necessary to force management to pay employees at a proper rate. In fact, as the Union and its attorneys know, Farm Fresh is required by law to pay its employees at the proper rate, whether a "written guarantee … [i]n a union contract" exists or not.

**3.** Although the Court has not been furnished with complete copies of all of the depositions in this case, the defendant has cited the depositions of named plaintiff Michele Shaffer, and opt-in plaintiffs Gail Rogers, Margaret Jones, and Terri Nuhfer, as evidence that none of the

plaintiffs have discussed fee arrangements with their attorneys. The defendants have not yet been successful in their attempts to depose the other named plaintiff, Stephanie Brooks. Brief in Support of Defendant's Motion for Sanctions, at 4, 6–7. Baptiste & Wilder has not contested the defendant's assertion, however, and the Court therefore considers the defendant's claims to be accurate. One of Baptiste & Wilder's attorneys emphasized to the Court that the Union was paying the costs of the litigation, but not his fee. He did not, however, discuss who was paying his fee, or whether Baptiste & Wilder considered the case to be a *pro bono* project.

The Court does not normally inquire into the fee arrangements of attorneys practicing before it. In this case, however, the fact that Baptiste & Wilder appears to be unconcerned about its fee is yet another indication that the Union's desires could have an inordinate effect on the firm's professional judgment. A law firm is a business, after all, and the voice of a paying customer speaks louder to a business than the voice of a nonpaying customer.

### IV.

A district court has broad discretion in determining whether disqualification of counsel is required in a particular case. *Whiting Corp. v. White Mach. Co.*, 567 F.2d 713, 715 (7th Cir.1977); *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d 706, 710 (7th Cir.1976). A court may require an attorney to withdraw from a case where even the appearance of impropriety exists. *Schloetter*, 546 F.2d at 709; *Gas–A–Tron of Ariz. v. Union Oil Co. of Cal.*, 534 F.2d 1322, 1324–25 (9th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *Richardson v. Hamilton International Corp.*, 469 F.2d 1382, 1385–86 (3rd Cir.1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973); *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F.Supp. 724, 732 (E.D.Va.1990). The Court has repeatedly held that it must balance a party's right to counsel of choice with its responsibility to insure the integrity of the proceedings before it and public confidence in the integrity of the bench and bar. *Tessier*, 731 F.Supp. at 729; *In re Asbestos Cases*, 514 F.Supp. 914, 925 (E.D.Va.1981) (*citing Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 757 (2d Cir.1975) (overruled on other grounds by *Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir.1980), *vacated & remanded*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981)); *Hull v. Celanese Corp.*, 513 F.2d 568, 569 (2d Cir.1975)).

The Virginia Code of Professional Responsibility governs the conduct of attorneys practicing before this Court. Local Rule 7(I). Canon 5 of the Code states, "A lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." One of the disciplinary rules derived from this Canon, and relevant to the instant motion, is DR 5–105, which reads in part:

> DR 5–105. *Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.*—(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).
>
> (B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

•      •      •      •      •

Rules of the Supreme Court of Virginia, Part 6, § II, Canon 5, DR 5–105 (Michie 1990); *see infra*, fn. 5.

After a thorough review of the record and the arguments of counsel, the Court finds that the exercise by the attorneys at Baptiste & Wilder of their independent professional judgment on behalf of the plaintiffs is likely to be adversely affected by the firm's representation of the Union. The fact that the Union is another of Baptiste & Wilder's clients alone would raise the possibility of an adverse effect on the independent professional judgment of the firm's attorneys. Here, however, the Union's direct involvement in the case has made the possibility into a likelihood, if not an actuality. The Union is not just another client for the firm; the Union is the party that brought the case to the firm's doorstep, the party who is paying the costs of the lawsuit, a party that stands to gain if the lawsuit is successful, the party that takes credit for the lawsuit, and the party that even a named plaintiff apparently considers responsible for the lawsuit. *See* Deposition of Michele A. Shaffer, at 74 (November 28 & 29, 1990) (plaintiff stated her impression that Baptiste & Wilder attorney was "handling the FLSA suit for the union"). These factors make it likely that the attorneys will be subject to any conflicts that exist between the Union's interests and the plaintiffs'.

Baptiste & Wilder argues that no conflict of interest exists between the firm's representation of the plaintiffs and the firm's representation of the Union. The firm argues that "vindication of the plaintiffs' claims by trial or settlement will coincide exactly with the Union's interests." Plain-

tiffs' Brief in Opposition to Defendant's Motion to Disqualify Counsel, at 12. The firm further argues that Farm Fresh's motion is a delaying tactic, and that Farm Fresh's assertions regarding potential conflicts of interest between the Union and the plaintiffs are "both speculative and specious." *Id.* at 2, 10.

The Court disagrees with these arguments.[4] The plaintiffs have a single interest in this lawsuit. They want to recover money that they claim Farm Fresh owes them for hours the company required them to work without pay or without proper pay. The Union may have this interest in common with the plaintiffs, but the Union has other interests as well. The Union is trying to become the elected bargaining representative of the Farm Fresh employees. Despite organizational efforts going back four years, the Union has not been successful in achieving this goal; the employees have not asked the Union to represent them. The evidence therefore indicates that the Union and the employees do not have identical interests.

In the face of these differing interests, the Court must disagree with Baptiste & Wilder's contention that vindication of the employees' interests is vindication of the Union's interests. The Court cannot ignore the Union's attempts to use the lawsuit to encourage employees to elect the Union. For this purpose, the mere existence of the lawsuit serves the Union's interests. Of course, the plaintiffs' winning the lawsuit would also serve the Union's interests. If the plaintiffs were to win quickly and quietly, however, through a confidential settlement, for instance, the Union would be unable to take full advantage of the lawsuit in its organizational efforts. To the extent that the Union is using the lawsuit's existence to promote its organizational goals, the lawsuit's disappearance would not be in the Union's interests.

Because Farm Fresh has not yet made any settlement overtures to any of the plaintiffs, Baptiste & Wilder dismisses as speculative any argument that a conflict could arise if Farm Fresh were to offer to settle the case confidentially. The issue, however, is not necessarily whether the conflict has already adversely affected the judgment of the plaintiffs' attorneys, but whether their judgment "will be or is likely to be" adversely affected by the conflict. Va.Code Prof.Resp. DR 5–105(A), (B). Baptiste & Wilder also dismisses the argument because its attorneys "doubt that this court would permit a representative plaintiff, who is charged with the duty to represent opt-in class members, to settle his or her claim confidentially." Plaintiffs' Brief in Opposition to Defendant's Motion to Disqualify Counsel, at 10 (citing Fed.R.Civ.P. 23(e)). Whether the Court would or would not approve such an agreement, however, is not relevant. The issue is whether the Union's involvement in the lawsuit, and the Union's financial relationship with the lawsuit and with Baptiste & Wilder, make it likely that Baptiste & Wilder's independent professional judgment on behalf of the plaintiffs will be adversely affected by its representation of the Union. If the firm's judgment is likely to be adversely affected, the adverse effect could prevent the parties from reaching a settlement agreement, whether the Court would approve the agreement or not.

Baptiste & Wilder argues that "[a]t present, it is useless to speculate how a hypothetical offer might be received" by the plaintiffs. *Id.* Again, the Court disagrees. Speculation as to how the plaintiffs and their attorneys might receive such a settlement offer is exactly what the Code of Professional Responsibility requires of an attorney. When an attorney represents two parties that are interested in one case, the attorney must "speculate" about how the dual representation could affect his or her judgment. The failure of the attorneys at Baptiste & Wilder even to consider that the interests of the Union might diverge

---

**4.** Regarding the motives of the defendant in bringing this disqualification motion, the Court points out that every member of the bar who is aware of facts justifying disqualification is obligated to bring those facts to the Court's attention. *See United States v. Clarkson,* 567 F.2d 270, 271–72 n. 1 (4th Cir.1977). The Court is then charged with determining the merits of the motion, and the motives of the movant are not relevant to this determination.

from the interests of the plaintiffs is yet another indication to the Court that their independent judgment is likely to be affected by the Union's interests in this lawsuit.[5]

Because the Union is conducting its organizational campaign at the same time that it is financing this litigation, it may wish to shorten or lengthen the case to coincide with the timing of its organizational drive. It has the ability to influence the course of the case by granting or withholding its financial support. Baptiste & Wilder insists that there is no evidence that the Union would use its financial support of the case to influence the firm's decisions, and that the Union "understands and respects the firm's insistence on the right to exercise its judgment in cases that proceed to litigation." Plaintiffs' Brief in Opposition to Defendant's Motion to Disqualify Counsel, at 10–11. The attorneys also argue that the Union would support the case independent of the organizational campaign.[6] *Id.* at 11.

The assertions of the attorneys at Baptiste & Wilder about the present intentions of the Union are not enough to dispel the likelihood that the Union's financial ties to this case will influence their independent professional judgment. A union's income consists largely of dues paid by its members. In financing the costs of this case, the Union is therefore using the dues of its current members to pay the costs of litigation for potential members. If the organizational campaign fails, the plaintiffs will

no longer be potential members. It would be unreasonable to assume that the current members of the Union would support the continued use of their dues to benefit employees who have decided not to join the Union, and will therefore never pay dues themselves. If the campaign were to fail, the Union would no longer have any reason to support the case, and would have good reason to withdraw its support. These are exactly the kind of "practical considerations" that the court must take into account when determining whether a conflict of interest exists. *Aetna Cas. & Sur. Co. v. United States*, 570 F.2d 1197, 1201 (4th Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978).

The Court finds that the Union has interests in this lawsuit that differ from the interests of the plaintiffs. The Court further finds that these differences create an actual conflict of interest that is likely to adversely affect the independent professional judgment of the attorneys at Baptiste & Wilder. On the basis of these findings, the Court holds that the attorneys at Baptiste & Wilder must be disqualified pursuant to DR 5–105 of the Virginia Code of Professional Responsibility.

## V.

██ In reaching the above conclusion, the Court has considered the Union as it would consider any other client of Baptiste & Wilder. In other words, the Court has

---

5. For instance, Va.Code Prof.Resp. DR 5–105(C) provides:

> In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

The Court has not addressed the effect of this provision of the Code on the case, because the plaintiffs' attorneys did not address the issue of disclosure in their briefs. The Court assumes from the attorneys' silence on this issue that they have not discussed the potential for conflict with any of their clients. Obviously, a party cannot consent after disclosure when there has been no disclosure.

6. As support for the contention that the case will continue regardless of the organizational campaign, the attorneys cite statements made by a Union official at his deposition:

> I know that whether we stop organizing tomorrow the FLSA will go on. If Farm Fresh decides to settle with people and feel like they've been wrong tomorrow, right now my plans are to still organize. So one doesn't hinge on the other. They are two separate things but it was derived out of the organizing campaign.

Deposition of Union official James L. Hepner, at 16–17 (November 19, 1990). These statements do not support the attorneys' contention. Hepner stated that the FLSA will continue if the campaign ends, and that the campaign will continue if the lawsuit ends, but he did not say that the Union will continue to support the case if the campaign ends.

held that the interests of one of Baptiste & Wilder's clients are likely to have an adverse impact upon the interests of the firm's clients in this case. Baptiste & Wilder argues that the Union is not just another client, but is a labor union, and that its relationship with the attorneys and the plaintiffs in this case is therefore protected by the first amendment. The law firm bases this contention on a string of Supreme Court cases.

In the cases cited by the plaintiffs, the Supreme Court overturned injunctions against labor unions that prohibited the unions from participating in various ways in litigation brought on behalf of their members. *United Transportation Union v. Michigan Bar,* 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); *United Mine Workers v. Illinois Bar Ass'n,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Brotherhood of Railroad Trainmen v. Virginia Bar,* 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964). In *United Transportation Union,* the union recommended certain lawyers to its members, set a cap on the fee those lawyers would receive, and paid the expenses of transporting union members to the lawyers' offices. *United Transportation Union,* 401 U.S. at 578, 91 S.Ct. at 1078. In *Mine Workers,* the union employed a lawyer on a salary basis to represent any of the union's members who wanted the lawyer to prosecute workmen's compensation claims. *Mine Workers,* 389 U.S. at 218, 88 S.Ct. at 354. In *Railroad Trainmen,* the union's Legal Aid Department selected lawyers or law firms in each of sixteen regions of the United States, and recommended these lawyers to members who sought legal assistance in bringing personal injury claims. *Railroad Trainmen,* 377 U.S. at 2, 84 S.Ct. at 1114. In each of the cases, the Supreme Court held that the first amendment protected the activities of the union. *United Transportation Union,* 401 U.S. at 576, 91 S.Ct. at 1078; *Mine Workers,* 389 U.S. at 222, 88 S.Ct. at 356; *Railroad Trainmen,* 377 U.S. at 5, 84 S.Ct. at 1116. The plaintiffs argue that they have a similar first amendment right to be represented by Baptiste & Wil-

der. They quote the following passage in support of their argument:

> In the context of this case we deal with a cooperative union of workers seeking to assist its members in effectively asserting claims under the FELA. But the principle here involved cannot be limited to the facts of this case. At issue is the basic right to group legal action.... The common thread running through our decisions in *NAACP v. Button,* [371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963),] *Trainmen,* and *United Mine Workers* is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. However, that right would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representation.

*United Transportation Union,* 401 U.S. at 585–86, 91 S.Ct. at 1082.

The Court is not persuaded by the plaintiffs' first amendment arguments. In each of the cases they cite, the union sought to aid its members. In each, the Supreme Court found that the first amendment protected the right of a union of workers to join together in order to help each other conduct legal activities. The Court of course accepts the Supreme Court's holdings. In the instant case, however, and with respect to the plaintiffs, the Union is a union in name only; it does not represent Farm Fresh employees in general, nor the plaintiffs in particular. Therefore, its involvement in the case does not entail a group of employees joining together to vindicate their legal rights; it entails a third party assisting a group of employees to vindicate their legal rights. In short, the Union's participation in the case is not collective activity, and therefore is not entitled to the same scope of protection that the Supreme Court has given to unions acting on behalf of employees who have chosen them as representatives.

The National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–69, protects the rights of employees to organize and to

choose representatives to conduct negotiations with their employers. 29 U.S.C. § 157. The NLRA also provides the methods by which a Union can earn the right to represent a group of employees. *Id.* § 159. Thus far, Farm Fresh employees have not chosen to organize or to select the Union as their representative. The Union's involvement in the litigation creates the impression that the Union has the right to represent Farm Fresh employees, when in fact it has no such right under the NLRA. The Union is aware of and has promoted this impression by pointing to the lawsuit as evidence that "The Union has already made a difference—and this is just the beginning." [7] The appearance that the Union has the right to represent Farm Fresh employees is exacerbated by the representative nature of the case, and could grow stronger if the Court allowed Baptiste & Wilder to remain in the case. In other words, to the extent the plaintiffs succeed in proving their claims that they are similarly situated with respect to a company-wide Farm Fresh policy to underpay its employees, they gain the right to represent a larger portion of Farm Fresh employees. This in turn increases the appearance that the Union has a right to represent the employees without adhering to the requirements of the NLRA.

The impression that the Union can ignore the requirements of the NLRA by using these judicial proceedings to represent Farm Fresh employees, despite never having been chosen by the employees as their representative, is a direct result of their participation in this case through their attorneys at Baptiste & Wilder. Allowing this impression to go unchecked would undermine federal labor law, as well as the integrity of the Court. As the Court has noted, the appearance of impropriety can justify disqualification in appropriate circumstances. *See supra*, part IV. Through its attorneys, the Union has attempted to become the *de facto* representative of the Farm Fresh employees in this lawsuit, without becoming the *de jure* representative of Farm Fresh employees through a proper election under the NLRA. This creates not only the impression that the Union can ignore the NLRA; it also creates the impression that the Union can use the Court as a tool in its organizational effort. Baptiste & Wilder's participation in and conduct of the case have contributed to these impressions, and create an appearance of impropriety that justifies disqualification.[8] The fact that the Union has not been elected by the employees, a fact that the plaintiffs' attorneys completely ignore in their brief on this motion, puts the Union's participation in this lawsuit through

---

7. The Union made this statement in a handout created by Union organizers and signed by the president of the Union, Tom McNutt. Deposition of Union official James L. Hepner, at 21. (Nov. 19, 1990). Union organizers distributed the handout to Farm Fresh employees, and may also have mailed the handout to them. *Id.* at 22.

8. At the Union's request, Baptiste & Wilder designed the questionnaires and the consent forms distributed to Farm Fresh employees by Union organizers. As the Court has noted, the attorneys at Baptiste & Wilder allowed the organizers to distribute these forms in combination with potentially misleading Union handouts. The opt-in forms were drafted in such a way that the employees who signed them affirmed nothing by their signatures except that they would like to receive any money that might come out of the lawsuit. The full text of the forms read:

> The employee below consents to become a party plaintiff to a civil action brought or to

be brought against Farm Fresh to recover wages which are or may be owed to this employee by Farm Fresh pursuant to the provisions of the Fair Labor Standards Act.

After the employees returned their signed forms to the Union, the Union turned them over to Baptiste & Wilder. When the Baptiste & Wilder filed them with the Court, it apparently did not review the identities or claims of the opt-in plaintiffs closely enough to realize that three of the employees had filed two forms each with the Union. The law firm filed six forms with the Court that represented only three opt-in plaintiffs. Although the Court's disqualification of Baptiste & Wilder is based on the conflict of interest and the appearance of impropriety, the Court notes that Baptiste & Wilder's attorneys have not demonstrated that they took care to ensure that they filed consent forms only for employees who had valid claims. This indicates to the Court that their independent professional judgment may already have been adversely affected by their relationship with the Union.

its attorneys beyond the scope of the first amendment protections described by the Supreme Court in *United Transportation Union, Mine Workers,* and *Railroad Trainmen.* It also creates an appearance of impropriety that supports the defendant's motion for disqualification.[9]

### Conclusion

Through its attorneys, the Union has created and promoted this lawsuit in an attempt to acquire in the courtroom what it has so far been unable to acquire in the workplace; namely, the right to represent Farm Fresh employees throughout Virginia. In so doing, it has created a conflict of interest for the attorneys at Baptiste & Wilder that is likely to affect adversely the attorneys' use of independent professional judgment on behalf of their clients in this case, the plaintiffs. The likelihood of this adverse effect merits disqualification of the law firm of Baptiste & Wilder. Through its attorneys, the Union has also created an appearance of impropriety, an appearance that the Union can use its money and attorneys to short-cut the election procedures of the National Labor Relations Act, and can use the Court as a campaign device in its organizational drive. This appearance of impropriety also merits the disqualification of Baptiste & Wilder.

For the reasons expressed in this opinion, the motion to disqualify the law firm of Baptiste & Wilder is GRANTED.

The plaintiffs shall promptly seek new counsel to represent them in this action. The plaintiffs are cautioned to avoid selecting counsel who will be subject to the conflicts of interest that have merited the disqualification of Baptiste & Wilder. The plaintiffs shall report to the Court within two weeks of the date of this Order on their efforts to secure new counsel.

The clerk is DIRECTED to send a copy of this Order to local counsel for the plaintiffs, to the law firm of Baptiste & Wilder, to the named plaintiffs Michele Shaffer and Stephanie Brooks, and to counsel for the defendant.

IT IS SO ORDERED.

## ON MOTION FOR RECONSIDERATION

This matter comes before the Court on plaintiffs' Motion for Reconsideration of Order Disqualifying Plaintiffs' Counsel, or in the Alternative, for Certification for Interlocutory Appeal under 28 U.S.C. § 1292(b). The Court has reviewed the plaintiffs' motion and the defendant's memorandum in opposition. Neither party has requested an oral hearing, and the Court feels that the issues are sufficiently presented in the briefs. For the reasons stated below, the Court denies plaintiffs' motion for reconsideration, and denies plaintiffs' motion for certification under 28 U.S.C. § 1292(b).

The Court has reviewed the facts of the case in detail in prior orders. *Order* (Dec. 28, 1990); *Order* (Feb. 21, 1991). On February 21, 1991, see page 1186, the Court disqualified the law firm of Baptiste & Wilder from representing the plaintiffs in the case, because the Court found that the independent professional judgment of the lawyers at the firm was, or was likely to be, adversely affected by their representation of another client. *See* Rules of the Supreme Court of Virginia, Part 6, § II, Canon 5, DR 5–105(B) (Michie 1990) [hereinafter cited as Va.Code Prof.Resp.]. Baptiste & Wilder now asks the Court to reconsider its ruling. Baptiste & Wilder argues that the Court erred in disqualifying it for two reasons. The firm argued both of these reasons in the brief it submitted on the defendant's motion for disqualification, and the Court thoroughly considered them

---

**9.** Because the plaintiffs' attorneys did not address the impact of the Union's non-elected status with respect to the plaintiffs and other Farm Fresh employees, but simply cited cases involving elected unions assisting their members, the Court has not had the benefit of their viewpoint on this matter. The attorneys apparently believe that the Union's lack of representative standing is not relevant to the disqualification motion. If so, the Court disagrees, for the reasons stated in its opinion. In the NLRA, Congress has attached a great deal of significance to whether a union is the chosen representative of a group of employees. *See* 29 U.S.C. §§ 157, 159.

in its Order disqualifying the firm. The Court therefore denies the firm's motion for reconsideration for the reasons that it granted the defendant's motion to disqualify the firm. *Order* (Feb. 21, 1991). The Court will summarize the arguments below.

## I. A Heightened Standard of Review was not Required

The firm first argues that because the Union's involvement in the case implicated the associational freedoms guaranteed to the plaintiffs and the Union by the first amendment, the Court should have used a higher standard of review in determining whether the firm was in danger of violating the Code of Professional Responsibility. As the Court has held, the activities of the Union and the law firm of Baptiste & Wilder are not entitled to the first amendment protection they seek. *Order*, at 1192–95 (Feb. 21, 1991). The Supreme Court has protected the rights of unions and their *members* to engage in group legal activity. *See United Transportation Union v. Michigan Bar*, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); *United Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Brotherhood of Railroad Trainmen v. Virginia Bar*, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964). The Supreme Court has not extended this right to protect the activities of a union such as the one involved in this case, which is "soliciting, financing and assisting ... litigation," *Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration*, at 24, on behalf of *non-members*, while simultaneously engaging in an organizational campaign targeting the non-members and their fellow employees.

The other cases cited by the firm, *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), and *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), likewise do not support its position. First, the cases are not factually on point. The two cases involved non-profit organizations whose basic purpose was to aid otherwise powerless litigants in asserting basic civil rights. In *Button*, the Supreme Court held that the state of Virginia could not prohibit the activities of NAACP members and lawyers in seeking to help litigants bring lawsuits to achieve desegregation in the public schools. *Button*, 371 U.S. at 420, 439–43, 83 S.Ct. at 331, 341–43. In *Primus*, the Supreme Court held that the first amendment protected the efforts of an ACLU-affiliated attorney to bring a lawsuit on behalf of a woman who had been sterilized as a condition of continued receipt of medical assistance throught Medicaid. *Primus*, 436 U.S. at 415, 439, 98 S.Ct. at 1896, 1908. In both cases, the Supreme Court fashioned a broad rule to protect the activities of organizations seeking to aid the assertion of civil rights. In doing so, it clearly accorded great weight to the politically expressive character of the activities engaged in by the NAACP and the ACLU. *Primus*, 436 U.S. at 428, 437–38, 98 S.Ct. at 1902, 1907–08; *NAACP*, 371 U.S. at 429, 431, 83 S.Ct. at 335, 337. By contrast, the Union in this case is not involved in the kind of political expression that is at the core of the first amendment. Its ostensible goal is to help the plaintiffs assert their statutory wage rights under the Fair Labor Standards Act. Such a goal does not entitle the Union and its lawyers to the broad protections the first amendment accords to the pursuit of basic civil rights.

For the reasons stated above and in the Court's prior Order, the Union's involvement in this case does not require the Court to apply a higher than normal standard of proof in its determination of the disqualification motion. Under the circumstances of the case, in which the Union is not involved in political expression, and is seeking to assert the legal rights of employees who are not members of the Union, the first amendment does not protect the lawyers from the normal operation of the Code of Professional Responsibility.

## II. Disqualification was Necessary

Baptiste & Wilder next argues that the Court disqualified the firm on the basis of speculation, hypothesis, and conjecture. The Court disagrees. On the basis of the facts before it, and the practical considera-

tions resulting therefrom, the Court found that the Union's stake in the prosecution and outcome of the litigation differed from the plaintiffs' stake in its prosecution and outcome. The Court found that these differing interests created an actual conflict of interest between the firm's representation of the Union in other matters and the firm's representation of the plaintiffs in this matter. Because the Union was funding the costs of the lawsuit, and had been intimately involved in the solicitation and prosecution of the lawsuit, it had already influenced the course of the litigation, and stood in a position to further distort the litigation to its benefit if it were allowed to remain.

The firm argues that the Court "adopted a standard for disqualification ... that has been applied nowhere else." *Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration,* at 10. The firm quotes the Court's statement that "[w]hen an attorney represents two parties that are interested in one case, the attorney must 'speculate' about how the dual representation could affect his or her judgment." *Id.* (quoting *Order,* at 1191 (February 21, 1991)). The firm seriously misreads the Court's Order when it states that this passage contains the standard under which the Court determined whether disqualification was merited. The Court used the standard contained in the Code of Professional Responsibility: "A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client." Va.Code Prof.Resp. DR 5–105. The statement of the Court quoted by Baptiste & Wilder was made in response to the firm's argument that it was "useless" to speculate about how the firm might receive a settlement offer from the defendant. *Plaintiffs' Brief in Opposition to Defendant's Motion to Disqualify Counsel,* at 10. The Court merely intended to emphasize for counsel that the Code of Professional Responsibility requires attorneys to ask themselves whether dual representation of clients with conflicting interests will affect their professional judgment.

The Court fully recognizes that disqualification of attorneys is not a step to be taken lightly, and that it should be based on practical considerations grounded in fact, rather than far-fetched conjecture. *See Order,* at 1192 (February 21, 1991); *see also Aetna Cas. & Sur. Co. v. United States,* 570 F.2d 1197, 1201 (4th Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). Nevertheless, based upon the practical realities presented by the posture of this case and the Union's involvement in it, the Court found that the attorneys at Baptiste & Wilder, if they had theretofore been able to represent the plaintiffs without regard to the Union's interest in the case, were not likely to be able to continue to do so. The Court has already reviewed its reasons for this finding. *Order,* at 1189–93 (February 21, 1991).

### III. Certification for Appeal under 28 U.S.C. § 1292(b)

■ Baptiste & Wilder has moved in the alternative for the Court to certify its disqualification of the firm for interlocutory appeal under 28 U.S.C. § 1292(b). Section 1292(b) reads in part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b). The firm argues that the Court should certify the following issue, which it quotes from the Court's disqualification Order:

> May a Union that is conducting a so far unsuccessful organizational campaign targeting a specific employee population ask its attorneys to design and prosecute a lawsuit on behalf of some of those employees against their employer under the Fair Labor Standards Act, fund the costs of the lawsuit, and attempt to use the existence of the lawsuit to garner

support for its organizational effort, all without impairing the ability of the attorneys to represent the interests of the employees rather than the interests of the Union?

*Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration,* at 29 (quoting *Order,* at 1189–90 (February 21, 1991)). The Court is not of the opinion that this passage constitutes "a controlling question of law as to which there is substantial ground for difference of opinion." The Court's determination of this issue in its Order was grounded in the specific facts of the case, and cannot be divorced from the facts in such a way that it is a "controlling issue of law." Nor is the Court of the opinion that any controlling issue of law in its Order was one over which substantial ground for difference of opinion exists. The law regarding disqualification of counsel is settled law, and the first amendment cases involving unions are also clear.

The Court is also of the opinion that an immediate appeal of the Order is less likely to "advance the ultimate termination of this litigation" than a denial of such an appeal. The disqualification of Baptiste & Wilder does not affect the merits of the plaintiffs' case. The case will therefore presumably proceed to its merits whether an immediate appeal is allowed or not. If immediate appeal is not allowed, the plaintiffs face a delay while replacement counsel familiarize themselves with the case. If an immediate appeal is allowed, on the other hand, the plaintiffs face a delay while awaiting appeal, and a potential further delay for replacement counsel to familiarize themselves with the case if the appeal is unsuccessful. The Supreme Court has held that an order disqualifying counsel is not a final order under 28 U.S.C. § 1291, nor is it reviewable under the collateral order exception to the final order doctrine. *Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985). Nothing about the facts or law of this case militate for a departure from the normal requirement that parties await the final determination of their disputes before taking appeal.

Baptiste & Wilder states in its brief that the plaintiffs are having difficulty retaining replacement counsel. The firm states that this is true "because of the restriction of the Court's order inhibiting the selection of labor lawyers and the plaintiffs' lack of funds to pay an attorney an advance retainer." *Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration,* at 30. In its Order disqualifying counsel, the Court cautioned the plaintiffs to "avoid selecting counsel who will be subject to the conflicts of interest that have merited the disqualification of Baptiste & Wilder." *Order,* at 1195 (February 21, 1991). Such a description does not extend to all labor lawyers. The plaintiffs are free to hire labor lawyers who do not have the Union as a client. And to the extent that the plaintiffs, none of whom claims to be indigent, may not have sufficient funds to pay an attorney an advance retainer, they merely face the dilemma that all civil litigants face; whether the relief sought in a lawsuit is worth the cost of maintaining the lawsuit. Neither of these concerns convince the Court that an immediate appeal would advance the ultimate termination of this litigation.

### Conclusion

For the reasons stated above, the plaintiffs' motion for reconsideration is DENIED, and the plaintiffs' motion for certification for immediate interlocutory appeal under 28 U.S.C. § 1292(b) is DENIED.

IT IS SO ORDERED.