56

# CIRCUIT COURT OF THE CITY OF NORFOLK

Melissa Gibson

v.

Medical Facilities
of America, Inc.,
Gregory Yanta,
and Mark Albright

January 22, 2010

Case No. (Civil) CL09-3289

BY JUDGE JOHN R. DOYLE

This matter came before the Court for arguments on September 16, 2009, and January 19, 2010 (on motion for reconsideration) upon two motions by Defendants Medical Facilities of America and Gregory Yanta, by counsel, and one motion by Defendant Mark Albright, which are as follows:

(1) Motion to Transfer Venue by Medical Facilities of America and Gregory Yanta;

(2) Motion to Transfer Venue by Mark Albright; and

(3) Plea in Bar and Motion to Compel Arbitration by Medical Facilities of America and Gregory Yanta.

The Court previously issued an Opinion Letter on September 25, 2009, but vacated the subsequent Order and reopened argument on one issue. The Court herewith reissues the Opinion Letter with the additional ruling on the newly submitted argument.

The court addresses each Motion in turn below.

## I. Motion To Transfer Venue
## by Medical Facilities of America
## and Gregory Yanta

The Court has already entered an Order on the Change of Venue Motions, but restates its reasoning here for the record.

### A. Facts

According to the Virginia State Corporation Commission records, Medical Facilities of America is the general partner of at least thirty-one healthcare facilities throughout the Commonwealth of Virginia. (Pl.'s Obj. Brief Ex. B.) This includes both the Chesapeake Health & Rehabilitation Center, where the assault at issue in this case took place, and the Norfolk Healthcare Center located in the City of Norfolk. Medical Facilities of America acts as the General Partner in each Limited Liability Partnership which owns these healthcare centers. (Med. Fac. of Am.'s Reply to Pl.'s Obj. Brief, p. 3.) Medical Facilities of America provides management oversight, site visits, and inspections.

Defendant Gregory P. Yanta is employed at Chesapeake Health & Rehabilitations Center and resides in Chesapeake. (Med. Fac. of Am.'s Mot. Br. 9.)

Defendant Mark Albright has a residence in Portsmouth and currently is incarcerated in Chesapeake. (Albright's Mot. to Transfer Venue.)

B. *Analysis*

In order for venue to be proper, it must be in accordance with the provisions of Va. Code §§ 8.01-261, 8.01-262. Va. Code § 8.01-260. Va. Code § 8.01-261 enumerates cases in which there is a "preferred venue." The case at hand does not fall into one of these categories. Va. Code § 8.01-262 specifies what are "permissive venues" in all other cases, such as this one. Permissive venue is where "the defendant regularly conducts substantial business activity." Va. Code § 8.01-262(3).

Medical Facilities of America regularly conducts substantial business in Norfolk, Virginia, making venue there proper. Medical Facilities of America is the sole general partner in the limited liability partnership that owns the Norfolk Healthcare Center in the City of Norfolk. As the sole general partner, they play a key management role in Norfolk Healthcare Center. This management role is sufficient to make the City of Norfolk a permissive venue for any case in which the Medical Facilities of America is a named defendant.

The Court finds this case discernable from the *Barnett* case relied on by the Defendants. In *Barnett*, venue in the City of Richmond was denied even though the defendant was a majority stockholder and supervisor of an air conditioning and heating company which had customers in Richmond. *Barnett v. Kite*, 271 Va. 65, 624 S.E.2d 52 (2006). All of the parties and witnesses in the case resided in Powhatan or Chesterfield. The differentiating feature in that case is that the company on which venue was based was not headquartered in Richmond and only five percent of their customers were in Richmond. *Id.* The Plaintiff based his venue argument on the fact that the company bought equipment from suppliers in Richmond. This situation is clearly different from the relationship between Medical Facilities of America and the City of Norfolk. Medical Facilities of America plays a management role in a company that is located in Norfolk.

Venue may be transferred from a permissive venue if "good cause" is shown. Va. Code § 8.01-265. Good cause may be a substantial inconvenience to the parties or witnesses. *Id.* The burden to demonstrate good cause or substantial inconvenience falls on the defendant. *Virginia Electric & Power Co. v. Dungee*, 258 Va. 235, 245, 520 S.E.2d 164 (1999). The Court has discretion in determining whether the defendant has demonstrated good cause to transfer, and the plaintiff's forum selection should be given favor. *Norfolk & W. Ry. v. Williams*, 239 Va. 390, 392, 389 S.E.2d 714 (1990).

Good cause to transfer venue has not been shown. There is no demonstration of substantial inconvenience to the parties or witnesses. Chesapeake and Norfolk are so close in proximity that there is not a substantial difference in difficulty in getting to one courthouse or the other.

## II. Motion To Transfer Venue by Mark Albright

A. *Facts*

Defendant Mark Albright has a residence in Portsmouth and currently is incarcerated in Chesapeake. (Albright's Mot. to Transfer Venue.)

B. *Analysis*

Venue is proper to all defendants if it is proper to one defendant. Va. Code § 8.01-263. As the Court found above, venue in this case is proper in Norfolk for Medical Facilities of America. Thus, venue is also proper for Mark Albright.

## III. Plea in Bar and Motion To Compel Arbitration by Medical Facilities of America and Gregory Yanta

A. *Facts*

Melissa Gibson has been a resident at Chesapeake Health & Rehabilitation Center (CHRC) since November 1, 2007. She was comatose at the time of her admission and has been so since.

Ms. Gibson was formerly a resident of a nursing home in West Virginia. Ms. Gibson was admitted to CHRC by her sister, Putiona Lige, who signed a Business Contract as a "Responsible Party" for Ms. Gibson. Ms. Lige informally had assumed the responsibility for caring for Ms. Gibson for some time. Ms. Lige resided in Chesapeake, Virginia. Ms. Lige desired to relocate Ms. Gibson to a nursing home in Chesapeake so as to have her close to where Ms. Lige lived. Ms. Lige thus entered into discussions with the defendant Nursing Home that led to the transfer of Ms. Gibson to that facility and the signing of the contract.

The Business Contract signed by Ms. Lige on November 1, 2007, for admittance of Ms. Gibson includes a Binding Arbitration Agreement. This provision states "Resident and Healthcare Center agree that ALL

CLAIMS, DISPUTES, OR DISAGREEMENTS BETWEEN THEM ... shall be submitted to BINDING ARBITRATION. . . ."

The contract designated the parties as Melissa Gibson, Putiona Lige, and CHRC. The contract contained signature lines for "resident" and "responsible party." Ms. Lige signed on the line as "responsible party." The "resident" line is unsigned.

At the time the contract was signed on November 1, 2007, Ms. Lige did not have a power of attorney (Ms. Gibson's coma apparently came on suddenly from cocaine intoxication) or legal guardianship over Ms. Gibson (no one had yet petitioned to be appointed guardian of the comatose Ms. Gibson). Ms. Lige and another sister, Pertia Lige, did ultimately petition the Chesapeake Circuit Court and were appointed co-guardians of Melissa Gibson on January 7, 2009, several months after the tort at issue occurred.

Thus, at the time the contract was executed, Ms. Gibson was comatose and all arrangements and decisions were made by Ms. Lige. Further, the transfer from one nursing home to another was occurring so as to locate Ms. Gibson in the city where Ms. Lige resided. Finally, the only authority by which Ms. Lige was operating was that of a loving sister seeking the 24 hour professional care for Ms. Gibson that the situation required and that she was unable to personally provide.

On July 3, 2008, Defendant Albright, a male nurse employee of the nursing home, sexually molested Ms. Lige.

There were Readmission Agreements signed by Ms. Lige after Ms. Gibson had to be taken out of the CHRC for hospitalization and then returned. This was done on November 4, 2008, January 8, 2009, and April 17, 2009.

The Defendants move the Court to Order the parties to arbitration as called for by a provision in the Business Contract.

B. *Analysis*

The Defendants set forth five grounds on which Ms. Gibson could be found to be bound by the Business Contract, and thus the arbitration agreement. They are (1) Virginia Code § 32.1-138(E) giving rights to closest family member of incapacitated persons, (2) the agency of Ms. Lige, (3) the apparent agency of Ms. Lige, (4) Ms. Gibson's status as a third-party beneficiary of the Contract, and (5) the effect of the Readmission Agreements signed by Ms. Lige subsequent to Ms. Lige

being appointed legal guardian of Ms. Gibson. The Court will take each argument in turn.

### 1. *Virginia Code § 32.1-138(E); Patient's Bill of Rights*

The Defendants rely on Virginia Code § 32.1-138(E) as a source of Ms. Lige's authority to sign on behalf of Ms. Gibson. Virginia Code § 32.1-138 is commonly known as the Patient's Bill of Rights. Subsection E gives "[a]ll rights and responsibilities specified in subsection A" of an incapacitated person to his or her "guardian, next of kin, sponsoring agency, or representative payee." This subsection merely gives all of the notification and information rights listed in subsection A to the next of kin of an incapacitated person who is residing in a healthcare facility. There is no indication in Virginia Code § 32.1-138 that the section was meant to automatically give authority equivalent to legal guardianship. The Court will not find that this statute gives implicit authority to Ms. Lige to bind Ms. Gibson in contract.

### 2. *The Agency of Ms. Lige*

The Defendants argue that signing the original contract as a "responsible party" meant that Ms. Lige had the authority and agency to bind Ms. Gibson to the contract. In support of this contention, the Defendants cite the Virginia Administrative Code's definition of "responsible party." The VAC defines a "responsible party" as "an individual authorized by the resident to act for him as an official delegate or agent."

First, the Court finds that it is obvious Ms. Lige had no real authority to bind Ms. Gibson to this contract. She did not have legal power of attorney or legal guardianship. Thus, there is no actual agency. Further, CHRC was in the position to know the legal regulations of signing on behalf of another person, and CHRC could have remedied the lack of agency had they wanted Ms. Lige to have the authority to sign on Ms. Gibson's behalf.

Second, the Court finds that reliance on the VAC statute to bind Ms. Gibson to the contract is misplaced for two reasons. First, the contract that Ms. Lige signed did not define "responsible party" and never referred to the VAC definition. By signing as Ms. Gibson's "responsible party." Ms. Lige was not making a statement that she had authorization from Ms. Gibson to sign as her agent. In fact, due to Ms. Gibson's comatose state,

there would be no reason to believe that Ms. Lige had any authorization from Ms. Gibson. Indeed, Ms. Lige did not sign on behalf of Ms. Gibson on the signatory line for "Resident." Second, the statute continues on to state, "A responsible person or party is not a guardian unless so appointed by the court." Therefore, simply being a "responsible party" does not give the legal ability to bind another person in contract. The Court finds that this statute does not allow the inference that Ms. Lige had any authority to sign for Ms. Gibson.

### 3. *The Apparent Agency of Ms. Lige*

Apparent agency exists when "one … permits another to hold himself out as agent and appears to acquiesce in that assumption of authority." *Giordano v. Atria Assisted Living, Virginia Beach, L.L.C.*, 429 F. Supp. 2d 732, 736 (E.D. Va. 2006) (quoting *Sanchez v. Medicorp Health Sys.*, 270 Va. 299, 618 S.E.2d 331 (2005)). There must be (1) an appearance of agency and (2) acquiescence by the principal, and (3) reasonable reliance by a third party. *Id.*

In this case, there was neither an appearance nor representation by Ms. Lige that she had the agency to sign for Ms. Gibson, nor any acquiescence by the principal, Ms. Gibson, nor reasonable reliance by CHRC.

First, Ms. Lige never represented that she had a legal guardianship or power of attorney. CHRC could have easily asked her if she had any authority to sign for Ms. Gibson and simply advised her to get one from the Court in a reasonable amount of time. There is no indication that Ms. Lige meant to give the appearance of having guardianship over her sister or held herself out as a guardian. By signing the "Responsible Party" line on the contract, it is reasonable to believe she thought it meant exactly what it stated, she was responsible for her sister's care.

Second, there cannot be apparent agency in this situation because the comatose Ms. Gibson was obviously unable to acquiesce or object.

Finally, there is no apparent authority because it would be unreasonable for CHRC to believe Ms. Lige had legal guardianship simply because she signed on the "Responsible Party" line. CHRC is in a business where guardianships and power of attorneys are regular and frequently seen. As a medical facility, CHRC should be familiar with the legal requirements when signing for another person, and as the drafter of the contract, CHRC was in a better position to ensure that it was executed

correctly. The Court cannot find in this situation that Ms. Gibson is bound to the contract due to the apparent authority of Ms. Lige.

### 4. Ms. Gibson's Status as a Third-Party Beneficiary

The third-party beneficiary rule is an exception to the general rule that a person must be a party to a contract to invoke it. Va. Code § 55-22. A person is a third-party beneficiary if the contract intended to confer benefit upon him. *Professional Realty Corp. v. Bender*, 216 Va. 737, 739, 222 S.E.2d 810, 812 (1976). A third-party beneficiary must directly benefit, not simply incidentally benefit, from the contract in order to sue. *Norfolk-Portsmouth Newspapers, Inc. v. Stott*, 208 Va. 228, 231, 156 S.E.2d 610 (1967).

The Defendants ask the Court to apply this rule in reverse, claiming that, if Ms. Gibson is a third-party beneficiary with the ability to sue under the contract, she should also be held to the burden of the arbitration provision in the contract. The Court finds that this argument is irrelevant to this case because Ms. Gibson's claims are not reliant on the contract.

When the Plaintiff brings an action in tort rather than contract, asserts no claim under the contract, and does not require the existence of the contract to proceed, the arbitration provision of the contract is not applicable to the controversy. *See Bishop v. Medical Facilities of Am.*, 65 Va. Cir. 187 (2004). However, simply suing in tort does not excuse a plaintiff from the provisions of the contract, the claim must not be significantly intertwined with the contract. *Id.*

Ms. Gibson has not brought a breach of contract claim, and her claims are not intertwined or dependent upon the contract. First, she alleges medical malpractice due to a breach of the standard of care. (Compl. ¶ 25.) In Virginia, medical malpractice cases may be brought in tort or contract. Va. Code 8.01-581.1. Medical malpractice cases brought in tort are adjudicated on the duty of reasonable care that a healthcare provider owes a patient outside of a contract. *Fairfax Hospital v. Curtis*, 254 Va. 437, 442, 492 S.E.2d 642, 644 (1997). This claim does not require the contract as a basis, and Ms. Gibson does not allege any duty based on the contract. Second, Ms. Gibson alleges negligence. Parallel to medical malpractice, negligence is not based on a duty arising from the contract. Instead, the negligence alleged by Ms. Gibson in the Complaint arises from a breach of the duty of reasonable care. (Compl. ¶ 30.) Finally, the claim for battery is clearly not grounded in contract.

Therefore, the Court finds that, even if Ms. Gibson was first found a third-party beneficiary to the contract, which actually had the primary purpose of transferring her to a location more convenient to her sister, and then also found to be bound by the arbitration provision, the arbitration provision would not apply to the causes of action alleged in her Complaint because they are brought in tort and are not substantially intertwined with the contract.

### 5. *Effect of the "Readmission Contracts"*

#### a. *Ratification of the Contract Subsequent To Obtaining Guardianship*

The Plaintiff and Defendant agree that Ms. Lige obtained legal guardianship over Ms. Gibson on January 7, 2009. It is further agreed that Ms. Lige signed the original Business Contract on November 1, 2007. There were Readmission Agreements signed by Ms. Lige after Ms. Gibson had to be taken out of the CHRC and then returned. This was done on November 4, 2008, January 8, 2009, and April 17, 2009. The last day Mark Albright sexually abused Ms. Gibson was July 3, 2008. Therefore, the Contract that would have been in effect on July 3, 2008, was the original Business Contract signed by Ms. Lige on November 1, 2007. At that time, Ms. Lige was not the legal guardian of Ms. Gibson.

The Defendants argue that, by signing the Readmission Agreements on January 8, 2009, and April 17, 2009, after becoming a legal guardian, Ms. Lige has ratified the original contract as legal guardian of Ms. Gibson. Thus, Ms. Gibson was bound by the contract on the date of the sexual abuse. This is the equivalent of retroactively applying the power of guardianship. The Court does not find merit in this argument.

While the Readmission Agreements incorporate the provisions of the original contract, they do not retroactively bind Ms. Gibson, through her guardian Ms. Lige, to the original contract At the time of the abuse, the contract in effect was the Original Contract, which was signed by Ms. Lige as a Responsible Party for Ms. Gibson, not as a legal guardian. The Court finds that the subsequent Readmission Agreements have no affect on the original contract.

#### b. *Readmission Agreement as Contract Requiring Arbitration of Existing Claims*

This argument was presented pursuant to a Motion to Reconsider granted by the Court. The Plaintiff objects to the Court's considering

argument based upon new legal grounds not raised at oral argument in September. The court vacated the Order of November 4, 2009, reopened argument, and will consider this new argument. The Plaintiff's exception is noted.

The chronology of events pertaining to this argument is as follows. First, Ms. Gibson was admitted to the defendant's facility (the "Nursing home") on November 1, 2007. A "Business Contract" executed that date is before the Court. (Exhibit A of Defendant's Plea in Bar and Motion to Compel Arbitration.)

Thereafter, whenever Ms. Gibson required hospitalization and was subsequently readmitted to the nursing home upon discharge from the hospital, a "Readmission Agreement" was executed. Such readmission occurred on three occasions and, on all three occasions, a Readmission Agreement was executed: November 4, 2008, January 8, 2009, and April 17, 2009. All three Readmission Agreements as a group comprise Exhibit B of the Plea in Bar and Motion to Compel Arbitration.

As previously noted, Putiona Lige was appointed as guardian for Ms. Gibson on January 7, 2009.

Defendants point to the January 8, 2009, and April 17, 2009, Readmission Agreements as contracts binding upon Ms. Gibson, as Ms. Lige was her guardian on those dates. Defendants contend upon rehearing that these contracts are new contracts that incorporate by reference the provisions of the original contract requiring arbitration. They further maintain that the incorporated arbitration provision includes past or pending disputes as well as future disputes. Thus, they maintain that the "dispute" arising from Mr. Albright's molestation of Ms. Gibson became subject to binding arbitration when Ms. Lige signed these Readmission Agreements.

The January 8, 2009, Readmission Agreement references an admission date and related documents dated November 1, 2008. (See Exhibit B, "Recitals," section A.) Thus, the Court finds that this Readmission Agreement does not incorporate by reference any documents executed on November 1, 2007. It also would seem that the subsequent April Readmission Agreement supplanted this Readmission Agreement. Thus, the Court will not consider it further.

The April 17, 2009, Readmission Agreement does reference the November 1, 2007, admission date and documents executed that date. Several issues arise concerning this document, which the Court will take up separately.

The first issue identified by the Plaintiff is that the Readmission Agreement incorporates by reference the "original Admission Agreement." (See Recitals, section C.I.) The only document in front of the Court executed at Ms. Gibson's original admission is a document entitled "Business Contract." The Plaintiff argues, and the Court is in agreement, that the reference to an "original Admission Agreement" does not serve to incorporate a "Business Contract."

The Defendant points to Sections VII and VIII of the Business Contract, which refers to "this Admission Agreement package," as evidence that the Business Contract is a document included among a group of documents entitled "Admission Agreement." Even so, there has only been a "Business Contract," and not an "Admission Agreement Package," presented to the Court. Contracts must be strictly construed. Because the only document presented to the Court, and presumably to the Plaintiff, is entitled "Business Contract," the Court declines to incorporate it into the Readmission Agreement when the Readmission Agreement references an "Admission Agreement." The Defendant created all of the contracts at issue here, and, thus, with little hardship, may have referenced the "Business Contract" as being incorporated if that was indeed the document meant to be incorporated. The Defendant alternatively could have evinced that the Business Contract was a subpart of an executed Admissions Agreement Package, but did not.

The second issue identified by the Plaintiff is that, on the Readmission Agreement, Ms. Lige signed on the line labeled "Responsible Party" and not on the separate lines labeled "Resident" and "Legal Representative." It is undisputed that the Chesapeake Circuit Court appointed Ms. Lige legal guardian of Ms. Gibson on January 7, 2009. Thus, when she signed the Readmission Agreement on April 17, 2009, she had the authority to sign in her capacity as Ms. Gibson's legal representative.

Nonetheless, the fact remains that she did not sign as the Legal Representative and the Defendant did not require her to sign as Legal Representative. Because Ms. Lige signed only as the Responsible Party for Ms. Gibson, the Court returns to the same analysis utilized above when determining whether the original contract signed by Ms. Lige as a Responsible Party bound Ms. Gibson to arbitration. For the reasons stated above, the Court finds that Ms. Lige signing only as a Responsible Party does not bind Ms. Gibson to the terms of the Business Contract. Again, had the Defendants meant to bind Ms. Gibson to the terms, only slight

vigilance needed to be exercised to ensure that the contracts were valid and executed correctly.

The Defendants also point to Virginia Code § 54.1-2986 and the Virginia Administrative Code as permitting a sister to authorize care. However, the point here is not the authorization of care, but the authority to bind another in contract. The Court thus denies this argument as well.

The final issue raised with respect to the April 17, 2009, Readmission Agreement is whether it controls past disputes. If it is assumed that the Readmission Agreement does incorporate by reference the Business Contract and that Ms. Lige signed as legal guardian of Ms. Gibson, both of which have been rejected by the Court, then the Contract going into effect on April 17, 2009, would read that "all claims, disputes, or disagreements ... be submitted to binding arbitration." The Defendant would have the Court interpret "all claims" as referring to all future, past, and present claims.

The Court first notes that, when the original Business Contract was executed, there was no past relationship whatsoever between the parties, and, thus, no contemplation that this clause could in any way refer to past or existing claims. In addition to desiring to incorporate this by reference, the Defendant would also give that clause new meaning by including for the first time past claims.

The Court finds that there was no meeting of the minds over this interpretation, and, thus, declines to apply it.

Defendant Mark Albright molested Ms. Gibson on July 3, 2008. Albright pleaded guilty to criminal charges relating to the molestation on November 24, 2008, in Chesapeake Circuit Court. Certainly, the parties were well aware of the molestation and the charges against Defendant Mark Albright when they signed the Readmission Agreement on April 17. In fact, less than a month later, Ms. Lige filed this suit against the Defendants.

In order for a contract to be valid, "the axiomatic meeting of the minds must occur ... . Arbitration agreements are no exception." *Giordano, ex rel. Brennan v. Atria Assisted Living,* 429 F. Supp. 2d 732, 736 (E.D. Va. 2006).

If the mutual intent of the parties on April 17, 2009, was for the well-known Albright molestation matter to be referred to binding arbitration, that agreement easily could have been spelled out. It is an implausible conclusion to find that, by signing a one-page document entitled "Readmission Agreement" (required by the Nursing Home to recheck Ms. Gibson into the facility following hospitalization) that

incorporated by reference a contract executed eighteen months prior, Ms. Lige meant to use her legal guardianship authority to bind Ms. Gibson to an arbitration clause concerning a dispute that arose nine months prior. Indeed without suggesting an undue intent on the part of the Defendants, it strikes one more as a trap that Ms. Lige fell into than an agreement to which she acquiesced.

Therefore, the Court finds that the Readmission Agreement, even if validly incorporating the Business Contract, does not operate to refer all disputes and claims ever existing between the two parties in the past to arbitration.

In sum, the Defendant would have the Court:

1. Substitute "Business Contract" for "Admissions Agreement";

2. Overlook that Ms. Lige signed only as "Responsible Party" and left the signature lines for "Resident" and "Legal Representative" blank; and

3. Find that all this signified agreement by Ms. Lige on Ms. Gibson's behalf that a very well known, but unmentioned, past dispute between the two would now be referred to arbitration.

To the contrary, the Court finds that the Readmission Agreement of April 17, 2009, did not incorporate the November 1, 2007, Business Contract.

The Court also finds that Ms. Lige did not sign the Readmission Agreement in her capacity of guardian on Ms. Gibson's behalf and thus Ms. Gibson is not bound to any terms of the Readmission Agreement.

The Court also finds that, assuming Ms. Lige did sign as guardian, the Readmission Agreement does not evince a mutual agreement to refer the subject matter of this lawsuit to arbitration.

*Conclusion*

The Court first finds that venue is appropriate in Norfolk for all parties. The Motions to Transfer Venue made by Medical Facilities of America, Gregory Yanta, and Mark Albright are all denied.

The Court also overrules Defendants Medical Facilities of America's and Gregory Yanta's Plea in Bar and denies the Motion to Compel Arbitration.

The Court notes that the Order regarding the Denial of the Motion for Change of Venue has been entered. The Court also notes that the defendants have filed their Answers.